|  |  |
|---|---|
| F. J. Petrovics | |
| vs. | Eq. No. 12275. |
| The King Holdings, Inc. | |

February 15, 1935.

CHURCHILL, J. Heard on petition to establish ownership of stock in The King Holdings, Inc.

The King Holdings, Inc., is a Rhode Island corporation. It was placed in receivership by decree of this Court entered on November 7, 1933.

At the hearing on the matter of a permanent receiver, there was a sharp dispute as to the ownership of stock, therefore provision was made in the decree appointing the permanent receiver for filing of claims to stock ownership in the corporation. The receiver reported on February 14, 1934, that Howard J. Bloomer claimed 33 1/3 shares, John J. King 100 shares, Edna J. Petrovics 1 share, and F. J. Petrovics 50 shares in his own right and 48 shares as trustee for John J. King. The total authorized capital stock was 100 shares.

The Schulte Real Estate Company, Inc., claimed as a creditor in reach and apply proceedings against the interest of John J. King.

Under leave of Court a petition was filed to establish ownership of stock in the corporation. In addition to the parties already named, two cross-petitions were filed: one by T. Clyde Foster and Edward G. Fletcher, and one by Guardian Securities Company and Wesley E. Barton. These claims were based on alleged contracts made either with King or with The King Holdings, Inc., and the prayers were that the several contracts be enforced or that, in the alternative, the cross-petitioners be decreed entitled to stock in the corporation or a lien on the patents held by the corporation.

John J. King had for some years previous to 1932 been exploiting a safety razor known as the King razor. Its distinctive feature seems to have been an oscillating blade. The design was later developed into a razor which had a double oscillating blade and patents were taken out from time to time in the names of various parties covering various features of the razor in its different stages of development.

King and F. J. Petrovics met in 1921. At that time King was developing the razor and from that time until 1933, the two men were on intimate terms and Petrovics participated in the promotion of the razor enterprise.

Prior to 1932, King had formed various corporations to manufacture and sell razors but all of these corporations became defunct before 1932. The only period prior to 1932 during which razors were manufactured in any quantity was in 1921 and 1922, when Carl Schoenert & Company of Newark, New Jersey, was engaged in the manufacture thereof. It does not appear that any considerable number of these razors were sold, however, and the enterprise was not a commercial success. It languished until 1932, when it took on new life.

In February 1932, King secured $1000 from the Guardian Securities Company of Chattanooga, Tennessee, and entered into an agreement with

that company whereby he agreed to transfer, or cause to be transferred, to the Guardian Securities Company 10% of the stock of a company to be formed by King for the purpose of manufacturing and selling razors. Under the terms of the contract this delivery of stock was to be made before May 1, 1932, and in the event that such stock interest was not transferred, the Securities Company was to be entitled to a one-tenth interest in all patents in connection with the razor and razor blades which were covered by the bargain.

At that time the situation in respect to the patents was this: Previous to November 14, 1931, King controlled three patents, standing in the name of King, Bunnell and Bergen. On November 14, 1931, King caused an assignment of all these patents to be made to one Carter.

On April 16, 1932, the King Razor Company was formed under the laws of the State of Delaware but the company was not organized until May 1932. On May 10, 1932, Carter executed assignments of the patents to F. J. Petrovics. These assignments were properly recorded and on the same day Carter executed an assignment of the patents to King, which assignment was not recorded.

Two other assignments of razor patents were made on the same day to F. J. Petrovics, one by King and one by Stavinski.

On May 11, 1932, the King Razor Company was organized to do business. A Board of Directors and officers were elected. King was neither a director nor an officer but it is clear that all of the persons acting in these capacities on behalf of the King Razor Company were dummies of King. It was during this period that the claim of F. J. Petrovics takes its rise. Petrovics testified that he met King in March 1932 and discussed the feasibility of the rehabilitation of the razor business, and that on May 6,

1932, after the King Razor Company had been given its charter—but before it was organized—it was orally agreed between King and Petrovics that they should join in promoting the razor business on an equal basis.

At the meeting of the Board of Directors of the King Razor Company, F. J. Petrovics, holding an assignment of all of the razor patents, came forward with a proposal to execute a license to the King Razor Company to manufacture and sell King razors and in return that company to issue to Petrovics 60.000 shares of stock, its total authorized capital, of the par value of $5 a share. This proposal was authorized by a vote of the Board of Directors. The resolution directed the stock to be issued to Petrovics "or to such persons as he may designate in such amounts and at such times as he or his assignee shall from time to time direct."

May 13, 1932, the license agreement between Petrovics and the King Razor Company was by Petrovics assigned to King. This license was cancelled on July 30, 1932, the reason being given on the record that "The King Holdings, Inc., had been incorporated and the proposed contract between Petrovics and the new corporation was more favorable to the interests of the King Razor Company".

Howard J. Bloomer, one of the claimants, was the attorney who was employed by King to organize the King Razor Company. He prepared documents and minutes in respect to its charter, by-laws and meetings, and acted generally as counsel in its organization.

King and F. J. Petrovics, in the summer of 1932, interested T. Clyde Foster, a manufacturing jeweler of Providence. R. I., and his attorney, Edward G. Fletcher, in the business potentialities of the King razor, and as a result The King Holdings, Inc., was incorporated under the laws of the State of Rhode Island on August 3, 1932, with a capital of 100 shares of non par

stock. The records of The King Holdings, Inc., show that at the meeting of the incorporators on August 3, 1932, Edna J. Petrovics subscribed for one share of stock, her husband, F. J. Petrovics, subscribed for one share of stock, and John J. King took one share of stock.

The Board of Directors, namely, King, F. J. Petrovics and Edna J. Petrovics, elected by the incorporators, held a meeting the same day and G. James Cottrell was elected president, F. J. Petrovics secretary and treasurer, and Edna J. Petrovics vice president. The company, by action of its Board of Directors, then took an assignment of the patents which then stood in the name of Petrovics and voted to issue the balance of the authorized capital stock, 97 shares, to F. J. Petrovics in consideration of the assignment of the patents.

Certificates of stock were issued: one to F. J. Petrovics, one to Edna J. Petrovics, one to John J. King, and 97 shares to F. J. Petrovics in a separate certificate (#4). The certificates bear date of August 3, 1932, and were regularly executed by the secretary, F. J. Petrovics, and the president, C. James Cottrell. These certificates remained in the stock book of the corporation and this book and other corporate records were left in the office of Howard J. Bloomer in New York City by F. J. Petrovics on his return to New York City from Providence, R. I. While the books were in Bloomer's office, Edna J. Petrovics and F. J. Petrovics signed a transfer in blank of the certificates standing in their names, the certificates still remaining in Bloomer's office with the corporate records. The date of these several assignments in blank was August 5, 1932. The certificates in this form remained in Bloomer's office for some time—the exact time can not be ascertained from the testimony—when either Cottrell, who was then acting as counsel for King, or King himself came to Bloomer's office and carried away all the records of The King Holdings, Inc., including these certificates of stock standing in the names of Edna J. Petrovics and F. J. Petrovics.

The certificates issued to Edna J. Petrovics is shown by the stock book to have been transferred in form to Charles A. Morton on August 5, 1932; the one share certificate of F. J. Petrovics was transferred in form to Edward A. Reppert on the same day, and the certificate for 97 shares in form to C. J. Cottrell on the same day. New certificates were made out to Morton, Reppert and Cottrell and Cottrell's 97 shares were transferred to King, who claims to have pledged them to one Van Der Mark.

Morton, Reppert, Cottrell and C. W. Van Der Mark were made parties to the petition to establish stock ownership and have been served with process, and all of them have allowed decrees pro confesso to be entered against them.

At the meeting of the Board of Directors of The King Holdings, Inc., held on August 3, 1932, a resolution was adopted authorizing the execution of a license agreement with the King Razor Company which was later reduced to form and duly executed. At the same meeting The King Holdings, Inc., was authorized to execute a contract with T. Clyde Foster and his associates to pay them 10% of the royalties received by the company under its license to the King Razor Company, when T. Clyde Foster and his group should pay $25,000 as a working capital into the treasury of the King Razor Company. No formal contract in accordance with the terms of the resolution was ever entered into but Foster and his group duly paid in the amount of $25,000 as working capital for the King Razor Company.

1. *Claims of John J. King and F. J. Petrovics.*

John J. King claims title to the entire 100 shares of stock of The King

Holdings, Inc., on the ground that Edna J. Petrovics and F. J. Petrovics were mere dummies in the entire series of transactions leading up to and including the issuance of certificates of stock to them on August 3, 1932.

F. J. Petrovics claims that of the 98 shares standing in his name, 50 belonged to him under the agreement of May 6, 1932, and that he holds 48 shares in trust for John J. King by virtue of the same agreement. Edna J. Petrovics makes claim to the one share of stock on the ground that it was issued to her for value.

To clear the way for an examination of the questions involved, it is first necessary to determine who has the legal title to the certificates of stock, and to the shares represented thereby, standing in the names of Edna J. Petrovics and F. J. Petrovics.

At the time the receivership proceedings were had in this Court, the question as to the legal title of the claimants was directly involved as between King and Edna J. Petrovics and F. J. Petrovics, and at that time, after a full hearing on the merits of this question, this Court ruled that the legal title to the certificates of stock, and the shares of stock represented thereby, issued to Edna J. Petrovics and F. J. Petrovics on August 3, 1932, remained in them, on the ground that no delivery of the certificates of stock had taken place by the transactions whereby King or Cottrell, his attorney, got the original certificates into their control.

It is claimed by Edna J. and F. J. Petrovics that this matter is res adjudicata.

This well may be, but the Court takes this occasion to find, and does find, after a second full and complete hearing on this question, and after full consideration and re-examination of the testimony bearing on this point, that it sees no reason to change its ruling previously made, and incorporates in this rescript its rulings on this point then made.

The Court finds that no delivery of the certificates of the stock of The King Holdings, Inc., which were issued to Edna J. Petrovics and F. J. Petrovics, bearing date of August 3, 1932, was ever made by the certificate holders or by any person having authority to act for them, and that, consequently, the legal title to the certificates and to the shares of stock represented thereby still remains in Edna J. Petrovics and F. J. Petrovics.

No embarrassment can arise by the claims of bona fide holders for value under the certificates of stock issued subsequently to Reppert, Morton and Cottrell. These three parties have disclaimed any title to any of the stock of The King Holdings, Inc. King maintained at the hearing that he had transferred the certificates for 97 shares of The King Holdings, Inc., stock of Van Der Mark in Cincinnati, Ohio, but inasmuch as Van Der Mark has allowed a decree pro confesso to go against him, it is quite evident that no such claim can be seriously considered.

Upon the foregoing findings and rulings, it follows that the certificates issued to Cottrell, Reppert and Morton were not legally issued and did not create such parties stockholders in The King Holdings, Inc., and conferred no rights on the holders of such documents.

Further, it is a consequence that the so-called special meeting of the stockholders of The King Holdings, Inc.—which it is claimed took place on April 18, 1933,—was void and of no effect as far as The King Holdings, Inc., was concerned, and that the pretended election of officers and directors at that time was also void and of no effect. As a further consequence, the pretended meeting of the directors of April 18, 1933, is also void and of no effect.

I also find as a fact that the notice of the special stockholders' meeting required by the by-laws of The King Holdings, Inc., was not given to either Edna J. Petrovics or F. J. Petrovics,

both of them stockholders of record at the time the pretended special meeting of stockholders was held.

I further find as a fact that the names of C. James Cottrell as "asst. treasurer" and Edward J. Reppert as "asst. secretary" were inserted in the minutes of the first meeting of the Board of Directors of The King Holdings, Inc., without any authority and at the instance of King, or with his consent and acquiescence; and I further find that such persons were never elected to the respective offices of assistant treasurer and assistant secretary which they pretended to fill.

In respect to the claim of King and the claim of F. J. Petrovics:

On the testimony put in by each of the claimants in support of their respective claims, there is a square conflict and hence a vital question of the credibility of the two chief witnesses, F. J. Petrovics and King. The demands of space forbid an extended exposition of the many matters which have constrained the Court to withhold its confidence in the veracity of King: his obvious self-contradictions; the improbability of his explanations; his manipulation of the corporate records when they were in his possession; his conversion of the certificates of stock of F. J. Petrovics and Edna J. Petrovics; his misapplication of the funds obtained from the Guardian Securities Company, may be mentioned as among the matters which have forced the Court to say that it can not accept his testimony unless strongly corroborated by credible witnesses.

F. J. Petrovics was not a skillful witness and had not the practical acquaintance with the schemes and methods of exploitation and promotion which King possessed and exercised. Petrovics at times fell in error in his testimony, but on the whole, after hearing his testimony and reviewing it, and observing his conduct and demeanor on the stand, the Court accepts his testimony as substantially correct on the main points in the controversy.

King took the position in support of his claim that F. J. Petrovics and Edna J. Petrovics were both mere dummies and hence he is entitled to the entire 100 shares of stock of The King Holdings, Inc.

It is clear from the documentary evidence in the case, and I so find, that Petrovics became connected with the King razor enterprise as early as 1921, when he first met King; that he was of material assistance to King in the development of the razor and in its exploitation; that he also assisted King in the enterprise with advances of money which have never been repaid, and that in the spring of 1932 he again engaged in association with King in the business of promoting the manufacture and sale of King razors.

The testimony of T. Clyde Foster on this point is illuminating. Speaking of the relationship between the two men when they came to Providence to press on his attention the merits of the King razor, he said:

"I was ill at my country home in Bristol and Mr. Petrovics was brought down there at Mr. King's request, the request being made on a former visit, that he wished to bring a friend down who was interested with him in this razor and subsequently, he brought Mr. Petrovics to my home in Bristol because I was ill and couldn't get to Providence and, at that time, the whole conversation revolved around—first, repeating the conversation that King and I had at my office a month previous and going over the whole ground again that we had previously been over for Mr. Petrovic's edification. Mr. Petrovics appeared to be a man that was equally interested in the situation with King. The conversation was referred back to Mr. Petrovics to see whether he agreed with Mr. King's analysis of the situation and the de-

cisions that Mr. King had made were put up to Mr. Petrovics."

I find that both before and after May 6th, 1932, F. J. Petrovics spent substantial amounts of money and spent time, effort, skill and labor in forwarding the success of the King razor enterprise, and that he so participated in association with King and with the expectation and intent on the part of both King and Petrovics that Petrovics should be paid and receive consideration therefor from King or be paid by an interest in any corporation which King might form to carry on the razor business.

In view of these findings of fact, the claim of John J. King to 100 shares of stock is hereby denied and dismissed.

Can Petrovics' claim to 50% of the stock of The King Holdings, Inc., be sustained in fact and in law?

Petrovics testified that after some discussion between himself and King in the spring of 1933 in regard to a rehabilitation of the razor business, he and King, on or about May 6, 1932, came to an agreement as to the basis on which Petrovics would continue his efforts in the development of the enterprise.

"A. I told him the only way I would join him in the business was 50-50. Well, I said, 'You have double crossed everybody, King.' * * * I said, 'Now, listen. You have done so many things that there is no reason for doing the same thing over again.' I said, 'All right, I will join you if you don't double cross me.' He said, 'Fred ——' He called me 'Pete'. 'Now I have come to a business basis now. You know there is something in it; I have something here and you helped me before and I am willing to compensate you for this thing that you have done. I want you to join the business. I like your sales plan. I know you are a capable man. I know your capabilities and the possibilities which you can do.' 'I agree to those terms that you indicate.' I said, 'I don't want to take anything that is unfair.' I want to see that you make money. I have a business. I said, 'I don't know about your business, but,' I said, 'if I can improve myself and make more money than I am making at the present time, I will join the business on a 50-50 basis. Under those conditions that I handle the case. Not otherwise.' "

It is strongly urged that the action of Petrovics in making an assignment of his rights to King when he entered into the license agreement with the King Razor Company, and his action in allowing King to conduct all the negotiations with Foster and Fletcher, and in executing a blank transfer of his stock in The King Holdings, Inc., and other acts of a like character, were acts so inconsistent with an interest in the razor business as to be fatal to his claim.

The explanation of both parties is that the assignment of the total interest in the patents to Petrovics and the issue of substantially all the stock in The King Holdings, Inc., to Petrovics were acts done to avoid the creditors of King, who was in an embarrassed financial condition, if not insolvent.

Petrovics says that he made the assignment of his rights under the license to the King Razor Company and executed the transfer in blank of the stock of The King Holdings, Inc., to prevent King's interest from being involved in the case of his (Petrovics') death. It must further be remembered that until at least the spring of 1933 and during the spring and summer of 1932, the two men were on highly confidential terms and, moreover, were doing much of their business without skilled counsel.

Foster's testimony as to the association between King and Petrovics has already been referred to, supra.

There remains to be considered the affidavits filed by Bloomer and Petrovics in the litigation between Bloomer and King and the King Razor Com-

pany and The King Holdings, Inc., in the spring of 1933. In this litigation, Bloomer claimed one-third of the stock of the King Razor Company. Bloomer himself made certain allegations in his affidavit which were inconsistent with Petrovics' claim now, and his explanation is that at the time he drew the complaint he did not know what he afterwards found out in regard to the stock of The King Holdings, Inc.

Petrovics in one of his affidavits simply stated that 97 shares of stock of The King Holdings, Inc., had been endorsed in blank and were in the possession of King. Standing alone that statement would be somewhat inconsistent with the claim he now makes, but in another affidavit, filed on July 10, 1933, he stated that the election of April 18, 1933, of The King Holdings, Inc. was illegal because he and his wife were owners of 99 shares of stock and that King had wrongfully possessed himself of the certificates. This affidavit goes far to counteract whatever inference might be drawn from the previous affidavit.

Taking as a whole the evidence bearing on this point, the Court finds as a fact that an agreement was entered into between King and F. J. Petrovics, on or about May 6, 1932, that Petrovics should have an equal interest with King in the King razor enterprise in consideration of Petrovics' cooperation with King in the business, as testified to by Petrovics.

Does this agreement extend to the point of giving Petrovics a 50% interest in the stock of The King Holdings, Inc.? The Court is of the opinion that it does. The only tangible things of value in which King and Petrovics were interested and the foundation of any promotion or exploitation of the razor business were the razor patents, and when these were transferred to The King Holdings, Inc., the only feasible method of satisfying the terms of the agreement as it stood was to give each of the parties to the agreement a

half interest in the stock of the corporation controlling the patents.

I rule on the facts found that F. J. Petrovics has made out his claim to one-half of the stock of The King Holdings, Inc., by a fair preponderance of the evidence. This is subject to and qualified by the findings in respect to the share of stock held by Edna J. Petrovics.

## STATUTE OF FRAUDS.

King interposes the defense that the oral agreement of May 6, 1932, is invalid under the Statute of Frauds of the State of New York.

Neither the statute nor the cases thereunder were proved as facts during the hearing but the point was not taken by any of the parties. Waiving this technicality and assuming that the New York statute and decisions thereunder are properly before the Court, I find the statute reads as follows:

"Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:

(1) By its terms is not to be performed within one year from the making thereof."

The testimony of Petrovics is all the testimony we have as to the terms of the contract as King denies that any such contract was ever entered into. From the testimony as quoted above in this rescript, on pages 13 and 14, it is quite clear that no term was set for the duration of the contract. In reply to a series of questions on cross-examination, Petrovics stated in effect that the agreement was to run for the length of the license agreement between Petrovics and the King Razor Company, but it is quite clear to the Court that what Petrovics did in his answers to these questions was to give his conclusions and his own interpretation of the contract rather than to state what

was actually agreed on between the parties. Reading the testimony of Petrovics as quoted above, it is quite clear that no such term was mentioned by either Petrovics or King when the agreement was arrived at.

On a consideration of all the evidence, the Court is unable to find that any such term limiting the contract to the life of the patent was embraced in the agreement.

Another consideration of importance is this: on May 6, 1932, no license had been executed by Petrovics to the King Razor Company, and after it was executed on May 11, 1932, this plan of operating under the patents was never completed. The device of a holding company to hold the patents was substituted.

It is quite evident from all of the testimony and from the situation as it existed on May 6, 1932, that the parties to the agreement of May 6, 1932, did not contemplate a partnership between them but did contemplate that their interest in the enterprise should be worked out through the medium of a corporation in which Petrovics and King should have an interest. The method of licensing the King Razor Company was abandoned and in its place a holding company was organized in which title to the patents was vested. The agreement between King and Petrovics envisaged satisfaction of its terms by an act which could be performed within a year, namely, vesting in each party an interest in a corporation which would be in receipt of the profits arising from the exploitation of the patents.

I find that both parties to the agreement understood and intended that such an arrangement should be carried out within a year, and it is likewise clear that under the terms of the agreement it could be carried out within one year.

I rule that the Statute of Frauds of the State of New York does not apply since the contract could be performed within a year.

Vol. 1, Re-Statement of the Law of Contracts, Sec. 198, pp. 262, 263.

F. J. Petrovics' claim is allowed to this extent: The Court rules that of the 98 shares of stock of The King Holdings, Inc., standing in his name, he holds 49 in his own right and interest and that he holds 49 shares as trustee for John J. King. King still has one share in his own name and Edna J. Petrovics has one share in her name.

## II. Claim of Edna J. Petrovics.

Edna J. Petrovics was given one share of stock of The King Holdings, Inc., at the time of the organization of that company, and she, too, makes claim to be a holder for value and to have a beneficial interest in the stock by reason of the fact of having entertained King at her house and extended similar courtesies.

This claim can not be considered as giving Edna J. Petrovics a claim of beneficial ownership in the one share of stock held by her. She no doubt has the legal title but in view of the character of the agreement between Petrovics and King as found by the Court, it follows that this contract demands that the ownership of stock in the Petrovics family be held to be 49 shares in F. J. Petrovics and one share in his wife Edna. Any other ruling would be contrary to the spirit and intent of the contract between the parties for an equal division of the fruits of the enterprise. She holds this one share interest in trust for her husband, F. J. Petrovics.

## III. Claim of Howard J. Bloomer.

Bloomer, is a lawyer practising in the City of New York. He met King in April, 1932, and at King's request attended to the details of the incorporation of the King Razor Company under the laws of the State of Delaware, and did other work in relation to its organization and drafted vari-

ous documents on behalf of King. About May 1, 1932, King stated thus to Bloomer: "he wanted me (Bloomer) to join him in the selling and distribution of King razors. He stated that if I would agree, I should be an officer and director of the company, that I should have an adequate salary and that I should have office accommodations to continue my law practice so far as I cared to, and that I should have a substantial block of the stock of the company, and at that time the company under its contract with F. J. Petrovics was to eventually own the patents covering the said King razors."

Bloomer spent much time on the affairs of the King Razor Company during the summer of 1932 and down to some time in September 1932. I find specifically that he performed such services, under the contract, as King requested of him, and that the services were substantial in character and in accordance with the agreement which was made between Bloomer and King on or about the first of May 1932.

Bloomer was not informed of the plan to incorporate The King Holdings, Inc., but learned of it afterwards, and drafted minutes of the meeting of the stockholders of the King Razor Company in order to meet the new situation which had been brought about by the formation of The King Holdings, Inc.

Some time during the fall of 1932 Bloomer called King's attention to the formation of The King Holdings, Inc., and stated to him that it had changed the entire picture by making it impossible for the King Razor Company ever to own the patents. Finally, in April 1933, Bloomer made a demand by letter on King for one-third of the stock of The King Holdings, Inc., and for one-third of the stock of the King Razor Company, and in that letter he stated to King that the customary fee for an attorney taking a case on a con-

tingent fee was one-third of the amount involved or one-third of the property involved. Shortly after the letter was received by King and on or about April 11, 1933, Bloomer had a conversation with King in relation to the contents of the letter of April 8, 1933, and Bloomer tetsified that King indulged in much conversation with him in respect to Fletcher and Foster but did not say anything which disagreed with the contents of the letter. Shortly afterwards Bloomer began a suit in New York for one-third of the shares of the King Razor Company and one-third of the shares of The King Holdings, Inc., but this suit was discontinued before the receivership proceedings were begun in Rhode Island.

If the evidence of Bloomer be attentively scanned, it will be noted that the agreement nowhere states that he (Bloomer) should have one-third of the stock of the King Razor Company. It was, on Bloomer's account, an agreement for a substantial block of that stock.

The Court has not overlooked, in considering this point, the letter of April 8, 1933, and Bloomer's testimony as to what King said after it had been received by him. It can not be seriously urged that the mere receipt of a formal letter of demand, previous to instituting suit, containing recitals such as were included in Bloomer's letter of April 8, 1933, together with a failure to deny the allegations in the letter, constitute a contract between the parties which a court could specifically enforce. The letter was a recital of past events rather than the proposal of a new contract or the modification of an already existing contract.

Under the traditional practice in suits for specific performance, this Court can not decree specific performance of a contract which is as indefinite as to the amount of shares to be conveyed as this contract is.

Again, the contract does not in terms

embrace stock of The King Holdings, Inc., and it would be an unwarranted exercise of power for the Court to undertake to write a new contract and then enforce it. In a claim of this character or a prayer for specific performance, the Court is limited to the contract as it was made and what the parties then and there agreed upon.

The prayer for specific performance must therefore be denied.

Bloomer next argues that if specific performance is denied the Court can, under the prayer for general relief, ascertain the amount of the damages he has sustained by virtue of the breach of his contract with King and decree a lien on the stock of The King Holdings, Inc., to which King may be decreed to be entitled, and cites as authority for this procedure:

Bellini vs. Neas, 50 R. I. 283;

Screw Products Corp. of American Inc. vs. Arenz, 52 R. I. 472.

Both were cases where fraud was found to exist. In the Arenz case the complainant, failing to get specific performance, was held to be entitled to alternative relief by reason of the fraud of the respondent. He was given a lien on certain patent rights to secure satisfaction of his claim for damages.

In the case at bar, fraud was not distinctly alleged in the petition, but it is alleged that the contract with King was for a substantial amount of stock in the King Razor Company; that it was represented to Bloomer by King that the King Razor Company would eventually succeed to the ownership of the inventions and patents; and it was shown that the organization of The King Holdings, Inc., was carried out without the knowledge of Bloomer.

In addition, the Court finds that King is insolvent and has no property out of which an execution could be satisfied except his stock ownership in The King Holdings, Inc.

True it is that in the Arenz case alternative relief was granted on the ground of fraud but an examination of the cases on which the opinion was based shows that the liberal rule of procedure followed is not only applied in cases of fraud but such rule may be invoked when there are special equities in favor of the complainant. The insolvency of King; his inequitable conduct in transferring his patents to The King Holdings, Inc., without the knowledge of Bloomer, which patents were the things of value on which Bloomer relied in making his contract; all these matters raise an equity in favor of Bloomer, which entitles this Court to ascertain the damages he has suffered, enjoin delivery of the stock in question to King and satisfy Bloomer's claim out of such stock.

To complete the record one other point remains to be considered. There was testimony on the part of King that Bloomer accepted $100 in full satisfaction of his claim.

Without discussing the evidence in detail, it is sufficient for the Court to find that Bloomer received $100 on account of his claim against King but that it was received on account and not in compromise, satisfaction or discharge of the obligation.

IV. Schulte Real Estate Company, Inc.

It appears that the Schulte Real Estate Company, Inc., is a judgment creditor of King and is prosecuting a bill in equity in this Court to reach and apply the interest in any stock to which King may be held to be entitled in this proceeding.

That a bill in equity may be prosecuted under such circumstances to reach an interest which is being litigated or is in process of ascertainment is settled by

Gorman vs. Stillman, 24 R. I. 264.

Whenever the Schulte Real Estate Company, Inc., shall obtain a final decree in this Court, such decree may be satisfied out of the stock interest of King in The King Holdings, Inc.

The prayer of the petition of the Schulte Real Estate Company, Inc., is granted, subject to the determination of the question of priority of the claim of Bloomer to payment out of the stock owned by King in The King Holdings, Inc.

## V. *Guardian Securities Company.*

The Guardian Securities Company, a Tennessee corporation, is a claimant under a written contract entered into between it and John J. King on February 24, 1932.. It is claiming, under its cross-petition, specific performance of the contract.

The contract recited that King owned certain patents covering a safety razor; that he intended to organize a corporation to manufacture and sell razors and razor blades under licenses to be granted by him to the proposed corporation, whose name was to be the King Razor Company. King then, in consideration of the sum of $1000 paid to him, agreed

(a) to form a corporation to manufacture razors and razor blades not later than May 1, 1932;

(b) to deliver on or before May 1, 1932, certificates of stock of such company to the Guardian Securities Company representing 10% of the total authorized capital stock of the company;

(c) if such 10% interest was not transferred in accordance with the agreement, then to transfer an undivided 1/10 interest "in and to all patents, applications, &c. in connection with the razor and razor blades".

The facts are undisputed and I find:

That the stock interest was not delivered on May 1, 1932, and likewise it is undisputed that demand was made for the stock and for the 1/10 interest in the patents, and it is likewise undisputed that no proceedings against King or either of the companies were taken by the Guardian Securities Company until the claim was filed before the receiver of The King Holdings, Inc., in November 1933.

As to the matter of the 10% undivided interest in the patents held by The King Holdings, Inc.:

It is quite clear, and the Court finds, that King and Petrovics, the beneficial holders of the stock of The King Holdings, Inc., knew of the contract. King made it and Petrovics knew that King had received $1000 for an interest in the razor business.

Wesley E. Barton acted with the full authority of the Guardian Securities Company and his acts bound that company.

He testified he made demands from time to time for the stock and an interest in the patents; that he made such demands on King and on no other person or corporation. While portions of his correspondence with King show some uneasiness concerning the non-delivery of the stock; yet it is clear that Barton and his associates were willing to allow the plan for financing the King Razor Company to develop in order that their own stock interests, or interests which they hoped to acquire in the future, might be made more valuable.

Barton continued to negotiate with King for a new contract, knowing that the Foster group in Providence proposed to furnish the King Razor Company with sufficient funds to start manufacture on a somewhat extended scale.

The resolution of The King Holdings, Inc., Board of Directors in respect to furnishing $25,000 to the King Razor Company was passed on August 3, 1932. In June 1932, Barton was told that Foster was interested in the development of the King razor; in August 1932, Barton knew that the patents had been transferred to The King Holdings, Inc.; King kept Barton advised of the development in the business and Barton also knew early in September, 1932, that it was proposed that the Foster group put $25,000 of fresh capital into

the King Razor Company, and Barton advised King that the Guardian Securities Company would be interested in investing further funds provided that Foster and his associates contributed new capital to the enterprise.

No move was made to protect the rights of the Guardian Securities Company until the claim was filed with the Receiver in November 1933. It was content meantime to allow the Foster group to perfect their plans for the development of the business.

As late as December 9, 1933, Barton stated to Fletcher that he "wanted the thing to go ahead for those who were honestly interested in it".

Foster and his associates paid $10,000 in November 1932 to the King Razor Company and the balance of $15,000 was paid to the same company within the three months following. These payments were made on the basis of an absolute and undivided ownership in the patents by The King Holdings, Inc., and of the exclusive license by that company to the King Razor Company which the Foster group controlled.

If the Guardian Securities Company by decree of this Court obtains a ten per cent. undivided interest in the patents held by The King Holdings, Inc., it spells the destruction of the exclusive license and irremediable loss to the persons who advanced $25,000 for the rehabilitation of the King Razor Company.

It is quite apparent from the facts found above that in lieu of enforcing its remedies at a time when the Guardian Securities Company knew that its rights respecting a 10% interest in the patents were threatened by the transfer of the patents, it stood by and speculated on the possible increase of the value of the razor enterprise arising from the expected substantial participation in the business by the Foster group.

To allow the claimant now to come forward under such circumstances and obtain by specific performance an interest in the patents which would give it the power to destroy the commercial value of the license would be clearly inequitable.

Specific performance lies in the sound judicial discretion of the Court and will be refused where it may cause disproportionate hardship or loss to the defendant or to a third person, or where there has been delay in enforcing rights which has resulted in loss to, or substantial change in the position of, the parties.

The claimant is not entitled to equitable relief.

2 Re-Statement of the Law of Contracts, Secs. 359, 367, pp. 638, 665;

*Ball* vs. *Milliken*, 31 R. I. 36 at 46; *Grosbeck* vs. *Morgan*, 206 N. Y. 385.

The cross-petition of the Guardian Securities Company is denied and dismissed, but without prejudice.

VI. *Claim of T. Clyde Foster and Edward G. Fletcher.*

These claimants pray for a decree declaring them to be entitled to 10% of the royalties paid by the King Razor Company to The King Holdings, Inc., under the license agreement, or, in the alternative, to 5 shares each of the stock of The King Holdings, Inc.

This prayer is based on the following undisputed facts:

On August 3, 1932, the Board of Directors of The Kings Holdings, Inc., passed a resolution authorizing the secretary of the corporation to enter into a contract on behalf of the corporation whereby in consideration of the payment to the King Razor Company of $25,000 for working capital by T. Clyde Foster and Edward G. Fletcher, Foster and Fletcher would be entitled to receive 10% of the royalties accruing under the license agreement with the King Razor Company.

No formal contract was ever entered into between the parties but the sum of $25,000 was paid into the King Razor Company by Foster and Fletcher, on the faith of the resolution of August 3, 1932, as working capital in 1932 and the early part of 1933. In various agree-

ments entered into between Foster and Fletcher and the King Razor Company; the King Holdings, Inc., and John J. King, this agreement as to royalties was recited.

F. J. Petrovics and King were members of the Board of Directors which passed the resolution of August 3, 1932.

I rule on the facts that T. Clyde Foster and Edward G. Fletcher are entitled to 10% of the royalties accruing under the license agreement between The King Holdings, Inc., and the King Razor Company.

There are no equities apparent, however, why the claimants should have equitable relief and their cross-petition is denied and dismissed, but without prejudice.

VII. *Assignments.*

It appeared in evidence that the claims of F. J. and Edna J. Petrovics, Howard J. Bloomer and the Schulte Real Estate Company, Inc., were, previous to the hearing on the merits, assigned to T. Clyde Foster. No question was raised as to the validity of the assignments.

It appeared that the assignments of F. J. Petrovics, Edna J. Petrovics and Howard J. Bloomer, did not convey the entire interest of the assignors in the subject matter of the litigation. The point was not pressed on final argument and I rule that these assignors retain sufficient interest to prosecute in their own names their several claims in this Court.

The Schulte Real Estate Company, Inc., made an unconditional assignment of the judgment on which its bill in equity is founded to T. Clyde Foster.

As far as the proceedings in this case are concerned, the cross-petition may be amended so as to show that T. Clyde Foster is the real party in interest.

A decree may be presented in accordance with the findings of fact and rulings of law in this rescript.